UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION



| | |
|---|---|
| SUSAN E. JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:07-cv-0698-DFH-WTL |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

ENTRY ON JUDICIAL REVIEW

Plaintiff Susan Jones seeks judicial review of a final decision by the Commissioner of Social Security denying her application for disability insurance and supplemental security income benefits. Acting for the Commissioner, Administrative Law Judge ("ALJ") Roseanne P. Gudzan determined that Ms. Jones was not disabled under the Social Security Act because she retained the residual functional capacity to perform a limited range of light work. As explained below the ALJ's decision is supported by substantial evidence and is therefore affirmed.

*Background*

Ms. Jones was forty-nine years old on her claimed onset date (May 26, 2004) and was fifty-one years old when the ALJ rendered her decision. R. 33, 295. Ms. Jones has a high school education and has taken some professional courses.

R. 296.  From 1980 until May 2004, Ms. Jones worked in public libraries, including as a circulation manager, circulation clerk, and cataloger.  She last worked on May 26, 2004.

I.     *Medical Record*

In January 2004, Ms. Jones began treating with Dr. Gordon Reed.  R. 128. She complained of pain originating in her neck and extending down her right arm and into her fingers.  Her significant symptoms were joint pain, muscle pain, depression, numbness, weakness and headaches.  Although she appeared uncomfortable, she did not appear to be in distress.  Her cervical and trapezius muscles felt tight on her right side, but her neck was not tender and showed no bony abnormalities.  Her shoulders were not tender and were symmetric, though Ms. Jones complained of pain when her arm was fully abducted and internally rotated.  Her elbows and wrists were normal, and she did not suffer from any weakness in her hands or any loss of grip strength.  R. 128.

On February 2, 2004, Ms. Jones began treating with a physical therapist for her neck pain.  R. 125.  She reported that she had suffered from intermittent neck pain for about two years, and that over the three weeks prior to her first physical therapy session, the pain had gotten worse and become constant.  There did not seem to be a specific reason for the onset of her symptoms.  She reported that her pain was made worse by bending, sitting, turning, or lying down, and by general

movement.  Her pain got worse as the day progressed.  No specific activities decreased her pain aside from being as still as possible and using ice.  Her range of motion was affected – she had minimal loss of protrusion, side bending left and right, and rotation left, she had moderate to minimal loss of flexion, and she had moderate loss of retraction, extension, and rotation right.  R. 125-26.  Ms. Jones' short term physical therapy goals were to "centralize" the pain in her cervical spine within a week to ten days, and to increase her cervical retraction and extension range of motion to "minimal loss" in two to three weeks.  Her long term goals were to abolish her central cervical spine pain in three to four weeks and to return to her normal activities in four weeks.  R. 126.

On February 5, 2004, Ms. Jones underwent an MRI of her cervical spine. R. 119.  Dr. Daniel Harris reviewed Ms. Jones' test results and reported that the MRI revealed that her spine was normal at the second to third cervical vertebrae, showed minimal faced hypertrophy without significant mass effect at the third and fourth cervical vertebrae, and showed a mild disc bulge and faced hypertrophy at the fourth and fifth vertebrae.  *Id.*  The mild disc bulge at C4-5 resulted in a minimal flattening of Ms. Jones' thecal sac and a very slight narrowing of her neural foramina.  The MRI showed a mild disc bulge and spurring, with minimal flattening of Ms. Jones' thecal sac and minimal narrowing of her central canal and neural foramina at the C5-6 level, and showed a broad based bulge and spurring at the C6-7 level, causing moderate narrowing to her left neural foramina and minimal flattening to her central canal.  At the C7-T1 level, Ms. Jones' spine

appeared normal.  Overall, Dr. Harris reported that Ms. Jones' vertebral bodies were of "normal height, alignment and signal" and that her spinal cord retained its "normal position, signal, and caliber."  R. 119.  She had mild multilevel spondylotic changes that "at most" appeared to be causing minimal flattening of the thecal sac and neural foramina at the various levels.  Dr. Harris noted that Ms. Jones' MRI did not reveal any focal disc herniation or significant narrowing to her central canal.

Ms. Jones also underwent an MRI of her lumbosacral spine on February 5, 2004, and Dr. Harris reviewed those test results, as well.  R. 120.  At the L5-S1 level, Ms. Jones had a mild loss of disc signal, with the possibility of very minimal loss of disc height.  She had very slight facet hypertrophy without significant mass effect.  At the L4-5 level she had very slight facet hypertrophy, again without significant disc abnormality or mass effect.  Her spine appeared normal at the L3-4, L2-3, and L1-2 levels, and overall, Dr. Harris reported that her vertebrae and conus medullaris were normal in height, alignment, and signal.  He reported that Ms. Jones showed "very minimal" degenerative changes but no definite or significant mass effect and no focal disc herniation.  R. 120.

On February 8, 2004, Ms. Jones went to the emergency room due to fatigue and because it felt as though her heart was "balled up and beating funny."  R. 123.  Although she was found to have iron deficiency anemia, she was not in distress, and her other lab work was normal.

Meanwhile, after four weeks of treatment and five sessions, Ms. Jones was released from physical therapy on February 26, 2004.  R. 152.  Upon her release, Ms. Jones no longer had arm pain and very seldom had minimal discomfort in her upper back and shoulders.  She reported that when she did have symptoms, she had usually been sitting for an extended period of time without correcting her posture.  If she corrected her posture and did minimal extension activities, her pain resolved and remained better.  The therapist noted that her sitting posture had improved significantly and that Ms. Jones was able to maintain a neutral head position.  She had minimal loss of motion on retraction and extension and all other planes were within normal limits.  All in all, her symptoms had "abolished."  R. 152.  When asked to review the treatment she had received from the physical therapist, Ms. Jones wrote, "coming here changed what I thought my life would be in the future."  R. 156.

In a March 12, 2004 appointment with Dr. Gordon Reed, Ms. Jones complained of chronic back pain but stated that her condition improved with physical therapy.  R. 121.  Even so, she still took an occasional Vicodin.

On February 15, 2005, Ms. Jones sought treatment from BHI Family Care Center, complaining of pain on the left side of her chest and pain and swelling in her left shoulder.  R. 118.  She stated that she had not been able to lift her left arm for about a month, speculating that an earlier dog bite had flared up.  *Id.*  She was diagnosed with left shoulder adhesive capsulitis.  The exam notes indicate

that she showed no symptoms or abnormalities except for her frozen left shoulder and pain in her left shoulder.  She received an injection of Depo Medrol and Lidocaine, was instructed to continue taking Vicodin and Naproxen, and was further instructed to return for another appointment in two months.  R. 118.  She returned on May 2, 2005.  Though she had pain in her neck and down her right arm and had limited mobility of her right shoulder, she reported that she had "done better" after the injections.  R. 92.

Dr. Joseph Koenigsmark, an osteopath with Story Consulting Services of Frankfort, Kentucky, examined Ms. Jones on March 29, 2005.  She told Dr. Koenigsmark that she had problems in her neck and lower back, in particular that she had degenerating discs in her lower back and cervical spine.  R. 111.  She also claimed to have difficulties with her shoulder and tingling in the fingers of her right hand, and that the pain in her lower back would sometimes radiate down into her legs.  R. 111.  Dr. Koenigsmark noted that Ms. Jones' doctors treated her with injections to her neck and lower back and that those treatments seemed to help but she continued to have pain in her shoulder.  R. 112.  Dr. Koenigsmark noted that Ms. Jones had tenderness and decreased range of motion in her left shoulder, and tenderness in her neck and lower back but no significant spasming.  Otherwise, her range of motion was largely intact.  R. 113-14.  She had a normal gait and was able to heel and toe walk.  She was able to do a fair knee squat with positive reinforcement.  Her motor strength was intact but for her strength in her left shoulder, which was decreased to a two or three (of five) due to pain.  R. 113.

On April 13, 2005, a Single Decision Maker (or "SDM") employed by the Social Security Administration reviewed Ms. Jones' medical records, including Dr. Koenigsmark's evaluation, and submitted a "Physical Residual Functional Capacity Assessment." R. 103-10. The SDM indicated that Ms. Jones was able to lift up to twenty pounds occasionally and up to ten pounds frequently, that she was able to stand or walk for up to six hours with normal breaks over an eight hour work day, and that she was able to sit for up to six hours with normal breaks during an eight hour workday. R. 104. The SDM noted that Ms. Jones was limited in her upper body, explaining that Ms. Jones had a limited range of motion in her left shoulder. R. 104-05. The SDM believed Ms. Jones was able to climb ramps and stairs frequently, and that she could balance, stoop, and kneel frequently. The SDM found that Ms. Jones was able to occasionally climb ladders, ropes, or scaffolds and could occasionally crouch or crawl. R. 105. Ms. Jones' ability to reach in all directions was limited because she could lift her left arm overhead only occasionally. R. 106. However, Ms. Jones was unlimited visually, environmentally, and in her ability to communicate, was not impeded in her sense of feeling, and was able to perform both fine and gross manipulations. R. 106-07.

On July 13, 2005, a consulting physician employed by the Social Security Administration reviewed the evidence available in Ms. Jones' file and reported that she suffered primarily from degenerative disc disease in her cervical and lumbar spine but also suffered from a frozen left shoulder and hypertension and obesity. R. 95-102. The physician opined that Ms. Jones could lift or carry twenty pounds

occasionally and up to ten pounds frequently, could stand or walk with normal breaks up to six hours in an eight hour work day, and could sit with normal breaks for about six hours in an eight hour workday. R. 96. Ms. Jones' ability to push or pull with her upper body was limited, but the consulting physician did not indicate how Ms. Jones' ability was limited. The physician found that Ms. Jones could frequently climb ramps or stairs and was able to balance, stoop and kneel frequently as well, but was able only occasionally to climb ladders, ropes or scaffolds, or to crouch or crawl. R. 97. The physician indicated that Ms. Jones' ability to reach in all directions, including overhead, was limited, but again did not indicate how it was limited. R. 98. The physician found that Ms. Jones was not limited visually, environmentally, or in her ability to communicate, and was also unlimited in her ability to feel and to perform gross manipulations or fine manipulations. R. 98-99.

In the fall of 2005, Ms. Jones sought treatment at Integrative Health Specialists of Indiana. She was seen by Robin Eldib, RN. R. 237-39. Notes from Jones' initial health assessment indicate that she reported that she had taken Synthroid for fifteen years but stopped taking the medication after the birth of her third child. R. 205, 237. She stated that she suffered from a torn disc in her lower back, degenerative arthritis in her cervical spine, a frozen shoulder, and anemia. Ms. Jones indicated that she wanted Integrative Health Specialists to manage her pain and care. R. 205.

Ms. Jones returned to Integrative Health Specialists on December 15, 2005, and saw Nurse Eldib.  Ms. Jones reported suffering from chronic back and neck pain and a frozen left shoulder.  R. 237.  She reported that her back had gone out the week before but was better at the time of her appointment.  She stated that she was not currently in physical therapy because she lacked insurance.  R. 237.  She stated that she was trying to get disability benefits and that her hearing was coming up soon.  *Id.*  Lab tests dated December 20, 2005 revealed that Ms. Jones had an elevated glucose level and was borderline for hypothyroidism.  R. 237.

Ms. Jones returned to Integrative Health Specialists on January 3, 2006 to have her disability paperwork completed.  R. 237.  Ms. Jones reported that she suffered from constant, chronic pain, and that she was able to sit for fifteen minutes at a time and then to walk for five minutes.  She reported decreased range of motion in her neck and that she suffered pain to palpitation of her cervical spine.  She reported suffering decreased ability to extend her back and move from side to side, decreased range of motion in her left arm, and decreased strength in her right hand.  In addition, Ms. Jones was prescribed Glucophage for diabetes and medication for hypothyroidism.  R. 237.

Dr. Douglas Smith of Integrated Health Specialists signed a Physical Residual Functional Capacity Questionnaire on January 3, 2006.  R. 242-46.  He indicated that Ms. Jones suffered from chronic pain caused by rheumatoid arthritis in her neck and a frozen shoulder.  R. 242.  He listed Ms. Jones'

-9-

symptoms as pain, fatigue, anxiety and palpitations, and reported that Ms. Jones suffered from pain in her cervical region, in her lumbar region, in her shoulder, and down into her arms and hands.  R. 242.  Her chronic and constant pain was worse with walking.  He reported that Ms. Jones suffered a decreased range of motion in her head and neck, decreased flexion in her neck and back, pain upon palpitation of her lumbar/sacral area, and very limited range of motion in her left shoulder.  He marked that Ms. Jones frequently would experience pain or other symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks, and that Ms. Jones was incapable of even "low stress" jobs because any movement would make her pain worse.  R. 243.

Dr. Smith estimated that Ms. Jones could walk less than one city block without rest or severe pain and that she could sit for only up to fifteen minutes at a time or stand five minutes at a time before needing to change positions.  R. 243. He noted that Ms. Jones could sit or stand and walk for less than two hours in an eight hour work day.  R. 244.  Ms. Jones would need to get up and walk around every fifteen minutes for five minutes each time.  He reported that Ms. Jones would need to take unscheduled breaks during an eight hour work day at fifteen minute intervals for about five minutes each.  He indicated that Ms. Jones could rarely lift and carry weights of less than ten pounds and could never lift and carry more weight than that.  R. 244.  She could never look down but could frequently turn her head to the left or right, look up, or hold her head still.  R. 245.  She could never crouch or squat, climb ladders or climb stairs, could rarely stoop, and

could occasionally twist.  In an eight hour workday, Ms. Jones could use her right or left hand to grasp, twist, and turn objects up to 20% of her day, could perform fine manipulations 10% of her day with the fingers of her right hand and 50% of her day with her left hand, and could reach overhead 80% of her day with her right hand and 40% of her day with her left hand.  R. 245.  Dr. Smith reported that Ms. Jones' impairments were likely to produce good days and bad days, but that most days were bad, and that she was likely to be absent as a result of her impairments or treatment more than four days of every month.  R. 245.

II.   *Testimony at the Hearing*

A hearing was held before the ALJ on February 1, 2006.  Ms. Jones testified that by May 2004 she was unable to work a full work week.  If she rested and iced her arms and back over the weekend, she was able to work a full day on Monday, but was in pain on Tuesday and on Wednesday faced a "fifty-fifty chance" of working a full day.  R. 304.  On Thursday and Friday "it just really depended."  R. 304.  She was unable to sit or use the computer for any length of time, she had difficulty concentrating, and, on days when she took pain medication, she was unable to drive.  R. 304.

Ms. Jones asserted that her neck, arms and hands suffered the most debilitating pain.  R. 305.  The pain in her neck and arms was constant, and she attempted to manage that pain with hydrocodone.  She had a torn disc in her lower back that caused her back to seize up sometimes, but she managed those seizures with ice and position changes.  R. 305.  In addition, Ms. Jones testified that she was diabetic, anemic, had an underactive thyroid, and had high blood pressure.  R. 305.  Also, her medications caused her to suffer certain side-effects.  Her anti-inflammatory medication and blood pressure medication made her dizzy and her pain medication made her drowsy.  R. 306.

On a pain scale from zero to ten (with zero being no pain whatsoever and ten being pain severe enough to go to the emergency room), Ms. Jones estimated

her pain level at the hearing to be an eight.  R. 312.  Usually her pain level was about six.  She testified that she was never totally without pain, but sometimes her pain would be four if her back had been iced and if she used physical therapy techniques for her hands.  R. 312.  Her pain increased when she used her hands, and got better when she was able to rest her arms on a pillow and took anti-inflammatory and pain medication.  R. 312-13.

Ms. Jones believed that she could sit for ten to fifteen minutes at a time before she had to stand up and move.  Otherwise, her back would seize up on her. R. 307.  She could walk far enough to get into a store from the parking lot but had to hang on to a cart to walk through the store with difficulty.  R. 307.  She was unable to do much lifting or carrying.  R. 308.  She no longer bought gallons of milk or two-liter drinks.  Instead, she bought half-gallons of milk and smaller six-packs of drinks.   R. 308.   Her husband did "ninety-nine percent" of the housework.  R. 308.  When Ms. Jones tried to do the dishes, she would drop and break many of them, and she was unable to go down the stairs to do the laundry. She tried instead to straighten up the house a little bit.  R. 308.

Ms. Jones decided not to drive anymore.  R. 308.  Driving prevented her from taking her pain medication, meaning that her arms were very painful.  Also, she felt that it was too dangerous for her to drive because her back seized up and her right leg went numb a lot.  She cut her hair short because she could no longer wash her long hair.  R. 309.  She spent her days watching television, reading

(though not as much as she once did), and doing crossword puzzles with oversized pencils. R. 309. She rarely visited her mother who lived forty minutes away because the car ride caused her pain. She visited with her grandson about once a month, but she did not spend time with her friends anymore because she did not feel like going out and enjoying herself with them. R. 309. She did not attend church or participate in any clubs. R. 310.

Constance Brown, a certified rehabilitation counselor, testified as a vocational expert at the hearing. Brown opined that Ms. Jones acquired several transferrable skills in her past work as a library circulation manager, circulation clerk, and cataloger, particularly "inter-relating" with the public, answering questions, eliciting information from the public, performing cash transactions, and keeping records. R. 314-15. The ALJ asked the vocational expert to consider a hypothetical individual of Ms. Jones' age, education, and past work, who retained the residual functional capacity to lift and carry up to ten pounds frequently and up to twenty pounds occasionally, who was able to sit for up to six hours in an eight hour work day, who could stand up to six hours, and who could walk a total of six hours when allowed to alternate positions for five non-consecutive minutes every hour. The hypothetical individual was not limited in the use of her lower body or in the use of her right hand and could frequently grasp and manipulate with her left hand. That person could frequently stoop and could occasionally climb ramps and stairs, crouch, kneel, and crawl, but could never climb ladders, ropes, or scaffolds and could never balance on uneven terrain. Also, the

hypothetical individual could occasionally reach overhead with her non-dominant left arm and could frequently reach out with her right arm.  The individual had no limits on handling, feeling, hearing, or speaking and could occasionally push and pull twenty pounds with her right arm and ten pounds with her left arm.  The vocational expert testified that this hypothetical individual could engage in Ms. Jones' past relevant work so long as ladders would not be required to reach upper shelves.  R. 316.

The ALJ then asked the vocational expert to consider the same hypothetical individual, but also to assume that because of pain, the individual was limited to performing simple, routine, repetitive tasks of unskilled work and detailed tasks of semi-skilled work but was unable to handle the complex tasks required of skilled work.  R. 316.  That individual, according to the testimony of the vocational expert, would not be able to perform Ms. Jones' past relevant work.  R. 317. However, the vocational expert testified that Ms. Jones' acquired skills would transfer to other semi-skilled jobs within the hypothetical individual's residual functional capacity.  Specifically, the vocational expert testified that Ms. Jones' skills would transfer to the positions of semi-skilled receptionist and information clerk, which were found at number 237.367-038 of the *Dictionary of Occupational Titles* (or "DOT").   Around twelve thousand such jobs existed in the State of Indiana.  R. 317.  If the hypothetical individual were limited to unskilled work, the vocational expert testified that she would be able to work as a general office clerk (DOT number "245.367-014") or a bookkeeping clerk (a sample of which would be

DOT number "219.587-010").  R. 318.  There were approximately five thousand general office clerk jobs and fifteen hundred bookkeeping clerk jobs in the state of Indiana.  R. 318.

*Framework for Determining Disability and the Standard of Review*

To be eligible for the disability insurance benefits and supplemental security income she seeks, Ms. Jones must establish that she suffered from a disability within the meaning of the Social Security Act.  To prove disability under the Act, the claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Ms. Jones was disabled only if her impairments were of such severity that she was unable to perform work that she had previously done and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to her in her immediate area, or whether she would be hired if she applied for work.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler,*

-16-

766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

To determine whether Ms. Jones  was disabled under the Social Security Act, the ALJ followed the familiar five-step analysis set forth in 20 C.F.R. § 404.1520 and § 416.920.  The steps are as follows:

(1)    Has the claimant engaged in substantial gainful activity?  If so, she was not disabled.

(2)    If not, did the claimant have an impairment or combination of impairments that are severe?  If not, she was not disabled.

(3)    If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)    If not, could the claimant do her past relevant work?  If so, she was not disabled.

(5)    If not, could the claimant perform other work given her residual functional capacity, age, education, and experience?  If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. §§ 404.1520, 416.920.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

The ALJ found that Ms. Jones satisfied step one.  She had not engaged in any substantial gainful activity at any time relevant to the ALJ's decision.  At step two, the ALJ found that Ms. Jones had the following severe impairments: degenerative disc disease of the spine, adhesive capsulitis of her left shoulder, amenia, a history of hypothyroidism, diabetes mellitus, obesity, and hypertension. These impairments did not meet or equal any of the listings that would have automatically qualified Ms. Jones for benefits at step three.  At step four, the ALJ determined that Ms. Jones was no longer able to perform her past relevant work.

At step five, the ALJ determined that Ms. Jones retained the residual functional capacity to perform a limited range of light work.  Based on the testimony of the vocational expert, the ALJ found that a person with Ms. Jones' residual functional capacity would be able to work as a receptionist, information clerk, general office clerk, or a bookkeeping clerk.  The ALJ therefore denied benefits.

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.  42 U.S.C. §§ 405(g), 1383(c)(3).  Because the Appeals Council denied further review of the ALJ's findings, the ALJ's findings are treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court.  42 U.S.C. §§ 405(g), 1383(c)(3);

*Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). The ALJ's decision must be based upon consideration of all the relevant evidence, and the ALJ must articulate at some minimal level her analysis of the evidence so that the court can trace adequately the path of the ALJ's reasoning. *Diaz*, 55 F.3d at 307-08.

*Discussion*

I.      *Weight Given to Opinion of Non-Physician Adjudicator*

Ms. Jones argues that the ALJ's findings regarding her residual functional capacity and credibility were in error because the ALJ erroneously weighed the determinations of a non-physician state agency adjudicator (a "Single Decision Maker" or "SDM") as the opinion of a non-examining physician.  Pl. Br. 7-10.  Ms. Jones argues that this error was harmful because the ALJ improperly gave "special status" to the SDM's opinion and relied "heavily" on that opinion.  Pl. Br. 9.  Ms. Jones argues further that by according weight to the SDM's determinations as medical opinions, the ALJ deprived her "of her statutory right to a de novo ALJ decision" because the ALJ is not permitted to give any weight to the fact that a claimant was previously found not disabled.  *Id.*

Ms. Jones supports her argument with *Dewey v. Astrue*, a case from the Eighth Circuit in which the appellate court remanded a decision because the ALJ misidentified a state agency adjudicator as a physician.  Pl. Reply 2, citing *Dewey v. Astrue*, 509 F.3d 447, 448-50 (8th Cir. 2007).  In *Dewey*, a state agency "Senior Counselor," not a physician, opined in a Residual Functional Capacity Assessment that the claimant was capable of light work, and the ALJ relied substantially on that opinion.  In doing so, the ALJ refused to give controlling weight to the opinion of the claimant's treating physician, who attested that the claimant was not capable of lifting and carrying more than ten pounds or standing and walking for more than two hours.  *Dewey*, 509 F.3d at 449.  The court was

unable to conclude that the ALJ inevitably would have reached the same result had he understood that the Residual Functional Capacity Assessment was completed by a lay person and not a physician, and the court remanded the ALJ's decision for rehearing.  *Dewey*, 509 F.3d at 449-50.

Here, the ALJ supported her opinion with sufficient objective medical evidence and medical opinions for the court to conclude that the ALJ would have reached the same result if she had understood that one of the two Residual Functional Capacity Questionnaires in Ms. Jones' file was completed by a lay person.  The ALJ conducted a comprehensive review of the objective medical evidence in support of her determination regarding both Ms. Jones' residual functional capacity and her ultimate decision that Ms. Jones was not disabled. R. 24-30.  In so doing, the ALJ considered results of Ms. Jones' laboratory tests from February 2004, which showed no more than "mild" or "minimal" spinal abnormalities.  R. 25-26.  The ALJ also considered that in that month, Ms. Jones responded very well to physical therapy, and her therapist believed that her remaining symptoms could be controlled with better posture and rehabilitative exercise.  R. 23-24.  Although Ms. Jones claims to have become disabled a few months later (in May 2004), the record does not show that she sought treatment from March 2004 to February 2005, when she claimed to have been suffering from left shoulder and arm pain for approximately one month and was diagnosed with shoulder adhesive capsulitis.  R. 23, 26.  Then, in March 29, 2005 and again on May 2, 2005 Ms. Jones reported that her left shoulder pain had improved with

treatment.  R. 23.  She did not seek treatment again until she was seen at Integrative Health Specialists of Indiana in October 2005.  R. 23, 26-27.  The ALJ also relied on the fact that Ms. Jones had worked in spite of her long-standing conditions of hypothyroidism and hypertension, and that there was no evidence to support a conclusion that her diabetes and anemia were not adequately controlled with medication.  R. 23.

Only after this review of the medical evidence did the ALJ look to the medical opinions available in the record.  R. 26-31.  Before considering the opinions of the state agency consultants, the ALJ considered the results of evaluations by Dr. Koenigsmark and Nurse Eldib.  Those examinations revealed that, other than suffering from a decreased range of neck and back motion and some tenderness in her neck and back regions, Ms. Jones had not had any significant motor, sensory, or reflex loss, and had not demonstrated any limitations in the use of her upper or lower body other than limitations related to her left shoulder adhesive casulitis.  R. 26-27.  The ALJ then considered the opinion of Dr. Smith, but decided not to give Dr. Smith's opinion much weight.[1]

Finally, the ALJ reviewed the opinions of the state agency consultants.  R. 29-30.  Referring to the opinions as the opinions of the "state agency *medical* consultants" (emphasis added), the ALJ made note of the fact that the first consucltant's opinion (which, upon additional scrutiny, the court knows to be the

---

[1]This issue is discussed in the following section of this entry.

*lay* consultant's opinion) was affirmed and adopted by the second state agency consultant – a physician.  Thus, the lay opinion, which the ALJ should not have weighed as a medical opinion, was reaffirmed entirely by a physician's opinion, which the ALJ could weigh appropriately as a consulting medical opinion.  Not only was the lay opinion fully supported by the physician's opinion, but the ALJ compared these opinions – the lay opinion and the medical opinion – to the objective medical evidence and found that *both* of these opinions were substantially supported by and were consistent with that evidence.  *Id.*  Ms. Jones has not brought forward any evidence or argument sufficient to cast into doubt whether, on this record, the ALJ's outcome would have been different had she known that only one of the non-examining state agency consultants providing opinions was a physician.  The ALJ did not adopt the consultants' opinions out of hand, but instead conducted a thorough review of the available objective medical evidence and then provided detailed reasons for her ultimate agreement with those opinions.  The ALJ's one mistake amounts to a minor oversight.  Without some indication that she erroneously relied exclusively on the lay opinion in defiance of the objective medical evidence and other medical opinions in the record, the error does not warrant a remand.

Ms. Jones argues that this mistake deprived her of her right to a de novo ALJ decision, stating, "the ALJ is not permitted to give any weight to the fact that a claimant was previously found not disabled," and that by giving weight to the determinations of the lay adjudicator, the ALJ did not render a de novo decision.

Pl. Br. at 9.  The key distinction here is between a non-binding opinion and a final determination.  The ALJ assesses a claimant's residual functional capacity and makes a determination of whether a claimant is disabled according to the five-step process outlined above.  See 20 C.F.R. §§ 404.1520,  416.920.  That decision is final and binding, subject to judicial review.  See 20 C.F.R. §§ 404.955, 416.1455. In reaching that determination, the regulations permit and in fact require an ALJ to consider and weigh non-binding opinions from various sources.  20 C.F.R. §§ 404.1512, 416.912.  Here, the lay adjudicator provided one of those opinions. That opinion was not, however, a final determination of disability subject to judicial review, and the ALJ's consideration of that opinion, among others, in making her final determination did not deprive Ms. Jones of her right to a de novo determination.

II.     *Weight Given to Opinion of Treating Physician*

Ms. Jones argues that the ALJ erred regarding her residual functional capacity and credibility because the ALJ improperly evaluated the January 2006 opinion of Dr. Smith.  The ALJ viewed Dr. Smith as a consulting physician.  R. 28. Ms. Jones argues that Dr. Jones was her "treating rheumatologist" and his opinion should be accorded greater weight.  Pl. Br. 10.  In support of this description, Ms. Jones points to the Physical Residual Functional Capacity Questionnaire Dr. Smith signed in January 2006, in which he indicated that he had treated Ms. Jones on a monthly basis since October 2005.  R. 242-46.  The record indicates that Ms. Jones' December 20, 2005 tests were ordered by Dr. Smith, and Ms. Jones testified that she had first visited Integrative Health Services in October 2005.  R. 240-41, 310-11.  Ms. Jones argues that if the ALJ doubted Dr. Smith's status as her treating physician, the ALJ should have contacted Dr. Smith to clarify the relationship.

A brief review of the record puts this argument to bed.  Before the ALJ on February 1, 2006, Ms. Jones testified that she had spoken with Dr. Smith on only one occasion, when he signed the Physical Residual Functional Capacity Questionnaire on her behalf.  R. 311.  She stated that although Dr. Smith indicated in the questionnaire that he had begun seeing her on October 25, 2005, his indication was incorrect.  R. 311.  Dr. Smith's name may appear on Ms. Jones' December 20, 2005 lab results, but Ms. Jones testified that a nurse practitioner

(presumably Nurse Eldib), not Dr. Smith, "is the one that did the diabetes and the thyroid work up and the anemia and all of that."  R. 310-11.  This testimony is confirmed by the fact that Nurse Eldib's name appears in Ms. Jones' treatment notes for her October and December 2005 and January 2006 appointments, but Dr. Smith's name does not appear.  R. 237-39.  Dr. Smith may have become Ms. Jones' treating physician some time after the hearing, but this record does not support Ms. Jones' argument that Dr. Smith was her "treating rheumatologist" on January 3, 2006, when he signed the questionnaire.

As for Ms. Jones' argument that the ALJ should have contacted Dr. Smith to resolve the extent of his doctor-patient relationship, the regulations direct an ALJ to contact a physician where the evidence presented is inadequate to support a determination of a claimant's disability.  See 20 C.F.R. §§ 404.1512(e), 416.912(e).  There was no such inadequacy here.  The ALJ was under no obligation to contact Dr. Smith to resolve an uncertainty that did not exist.

Because the ALJ determined that Dr. Smith was Ms. Jones' consulting physician rather than a treating physician, the ALJ did not err in weighing Dr. Smith's questionnaire responses.  The ALJ has the discretion to weigh conflicting medical opinions.  See 20 C.F.R. §§ 404.1527, 416.927.  In weighing conflicting medical opinions, the ALJ must take several factors into account, including whether the source has examined the claimant, whether the source is a treating physician, whether the opinion is properly supported, whether the opinion is

consistent with the record as a whole, and whether the source of the opinion is a specialist.   See 20 C.F.R. §§ 404.1527(d), 916.927(d).   However, any medical opinion on which an ALJ relies should be based on objective observations and should not "amount merely to a recitation of a claimant's subjective complaints." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).   In any case, the ultimate responsibility for determining disability remains with the Commissioner or ALJ. See 20 C.F.R. §§ 404.1527(e)(1), 916.927(e)(1).

Here, the ALJ explained why she did not give great weight to the opinion Dr. Smith in the Physical Functional Residual Capacity Questionnaire. R. 28-29.  Dr. Smith's only apparent contact with Ms. Jones was on the day he signed the questionnaire.  His assessments in the questionnaire were unsupported by any objective medical evidence and appeared to be based entirely on Ms. Jones' statements.  As the ALJ explained, "merely reciting the claimant's symptoms and perceived limitations and then concluding that the claimant cannot do much of anything is insufficient." R. 28.  Though Dr. Smith noted that Ms. Jones suffered from a decreased range of motion of her head and neck, decreased flexion in her neck and back, pain to palpitation in the lumbar/sacral area, and very limited range of motion in her left shoulder, the ALJ found that these limitations did not correlate to the severely restricted residual functional capacity marked by Dr. Smith in the questionnaire. R. 28-29.  This was a reasonable explanation for the ALJ's decision to discount the weight given Dr. Smith's opinion, and the court does not find error.

III.    *Vocational Expert's Deviation from DOT Listing*

Ms. Jones argues that because the vocational expert's testimony deviated from the *Dictionary of Occupational Titles* (or "DOT") without justification and the ALJ relied on that testimony, the ALJ committed reversible error.  Specifically, the vocational expert testified that a hypothetical individual of Ms. Jones' age, education, and past work experience, who had the residual functional limitations as described by the ALJ but was limited to unskilled work could work as a general office clerk at DOT number "245.367-014."  R. 317-18.  Ms. Jones contends that DOT occupation 245.367-014 is the position of blood donor unit assistant, not general office clerk, and moreover that the listing for general office clerk, found at DOT number 219.362-010, describes that position as semi-skilled work, not unskilled work.  Pl. Br. 14-15.  She also contends that the vocational expert testified that the "general office clerk" position could be both sedentary and light, but that under the DOT, jobs have one and only one level of exertion.  R. 318; Pl. Br. 15.  Finally, Ms. Jones contends that the ALJ erred by relying on the vocational expert's testimony that the DOT listing for bookkeeping clerk corresponds to DOT number 219.587-010, when that number actually marks the listing of parimutuel ticket checker, not bookkeeping clerk.  Pl. Br. 15.[2]

---

[2]The vocational expert testified that DOT number 219.587-010 was "a sample" bookkeeping clerk position.  R. 318.  The ALJ did not explore what the vocational expert meant by that, leaving open the question of what a bookkeeping clerk is according to the DOT.

An ALJ has an affirmative duty to determine whether a vocational expert's testimony is consistent with the DOT, and has the responsibility to ask about any possible conflict between the vocational expert's testimony and the information provided in the DOT, obtaining a reasonable explanation for the apparent conflict. See Soc. Sec. Ruling 00-4p.  In *Prochaska v. Barnhart,* the ALJ took testimony from an expert as to whether certain job requirements were compatible with the claimant's various limitations, but committed reversible error when he failed to explore areas where the expert deviated from the DOT, leaving it an open question whether the DOT's job requirements included reaching above shoulder level or stooping, which the claimant could not do.  See *Prochaska*, 454 F.3d 731, 735 (7th Cir. 2006).  Here, though perhaps an oversight, the ALJ failed to clarify exactly which unskilled jobs the vocational expert referred to in her testimony – general office clerk and bookkeeping clerk, as she named, or blood donor unit assistant and parimutuel ticket checker, as the DOT numbers she listed indicated.

When the ALJ's decision is unreliable because of serious mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion, in which event a remand would be pointless.  See *Sarchet*, 78 F.3d at 309.  Here, sufficient uncontroverted evidence supports the ALJ's decision for the court to find that the ALJ's mistake did not amount to reversible error.  The ALJ found that Ms. Jones was capable of either semi-skilled or unskilled work, and the vocational expert testified (correctly) that the job of receptionist or information clerk was a semi-skilled position found

at DOT number 237.367-038 and opined that this position was compatible with Ms. Jones' age, education, and residual functional capacity.  R. 31-32[3], 317.  Ms. Jones does not dispute that this testimony, at least, was consistent with the DOT, and that 12,000 receptionist jobs exist in the state of Indiana.  Thus, the Commissioner met his burden of demonstrating that Ms. Jones was capable of performing other work given her residual functional capacity, age, education, and experience.  20 C.F.R. §§ 404.1520, 416.920.  The court is satisfied that, on this record, no reasonable trier of fact could have come to a different conclusion, and the court does not find reversible error.

---

[3]The ALJ referred to the numerical DOT listing for receptionist as 237.367-038 (which is the correct number) but also as 237.267-038 (an incorrect number). R. 32.  Ms. Jones does not raise this discrepancy as reversible error and the court presumes the incorrect number was a typographical error.

IV.     *ALJ's Hypothetical Question Regarding Stooping*

Ms. Jones argues that the ALJ improperly relied on information provided by the vocational expert that was based on the ALJ's inaccurate and incomplete hypothetical question, and thus was unreliable testimony.  Specifically, the ALJ asked the vocational expert to testify regarding work possible for someone of Ms. Jones' age, education, and past work experience and who had the residual functional limitations as described by the ALJ.  However, when the ALJ described the residual functional limitations of the hypothetical individual, she described an individual who could stoop frequently.  R. 315.  The ALJ later found that Ms. Jones could stoop only occasionally.  R. 21.

Ms. Jones does not argue that the ALJ erred by finding that she was capable of jobs that require frequent stooping, only that the ALJ misspoke when describing the hypothetical individual's residual functional capacity to the vocational expert.  The residual functional capacity of the hypothetical individual presented to the vocational expert does not match exactly the ALJ's determination regarding Ms. Jones residual functional capacity in this limited respect.  However, without some demonstration that Ms. Jones suffered actual harm from this mistake, such as a showing that one of the jobs the ALJ found Ms. Jones capable of performing required frequent stooping, while Ms. Jones was able to stoop only occasionally, the court will not remand on this ground.

V.      *Ms. Jones' Age at the Time of ALJ's Decision*

Ms. Jones claims that the ALJ committed reversible error because she failed to take into account her age when determining that she was not disabled. Ms. Jones was born in 1955 and was fifty-one years of age at the time of the ALJ's decision. Ms. Jones argues that because she was between fifty and fifty-four years of age, was restricted to unskilled, sedentary work, and had a high school education, the regulations mandated a finding that she was disabled. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14. The record does not support this conclusion. The ALJ found that Ms. Jones was capable of light work with some restrictions and was capable of semi-skilled (as well as unskilled) positions. R. 21; see 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 202.13, 202.14 ("not disabled" listing for high school graduate approaching advanced age capable of light, unskilled or light, semi-skilled work). Ms. Jones may not agree with the ALJ's decision, but the ALJ's decision is final and binding, subject to judicial review, and Ms. Jones has not shown reversible error. See 20 C.F.R. §§ 404.955, 416.1455. Ms. Jones was not so restricted as to mandate a finding that she was disabled under the medical-vocational guidelines of the regulations.

*Conclusion*

The ALJ determined that Ms. Jones did not establish that she was disabled under the law. Because the ALJ's decision was consistent with the law and supported by substantial evidence, the court affirms the ALJ's decision and will enter final judgment accordingly.

So ordered.

Date: April 14, 2008

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

J. Frank Hanley, II
lawoffices@jfrankhanley.com,eric@schnaufer.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov,tracy.jones@usdoj.gov,lin.montigney@usdoj.gov